UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
| --- | --- | --- |
| MARK D. DEMOSS, | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | No. 3:05CV00736 (DJS) |
|  | : |  |
| NORWALK BOARD OF ED., ET AL., | : |  |
| Defendants. | : |  |

MEMORANDUM OF DECISION AND ORDER

The Plaintiff, Mark DeMoss ("DeMoss") brings this action against Lynne Moore ("Moore"), individually and in her official capacity as Principal of West Rocks Middle School; Salvatore Corda ("Corda"), individually and in his official capacity as Superintendent of the Norwalk Public Schools; and the Norwalk Board of Education ("the Board"). In his eighteen-count amended complaint, DeMoss alleged First Amendment retaliation against him by Moore, Corda, and the Board (counts one through five), violation of his right to equal protection by Moore, Corda, and the Board (counts six through ten), racial discrimination in violation of Title VII and the Connecticut Fair Employment Practices Act ("CFEPA") by the Board (counts eleven and twelve), retaliation for filing discrimination complaints in violation of CFEPA by the Board (counts thirteen and fifteen), sexual orientation discrimination by the Board in violation of CFEPA (count fourteen), retaliation in violation of Title VII by the Board (count sixteen), and violations of Connecticut General Statutes §§ 31-51q and 31-51m by all defendants (counts seventeen and eighteen). Defendants have filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that hereafter follow, the motion for summary judgment (doc. #79) is **GRANTED in part and DENIED in part.**

1

I.    FACTS

Plaintiff, Mark DeMoss, is a white male who is homosexual.  He was formerly employed by the Norwalk Board of Education as a teacher from 2000 through 2003.  In 2001 DeMoss began teaching mathematics and science at West Rocks Middle School ("WRMS").  At all times relevant to the Complaint, the defendant Moore was the Principal of WRMS and the defendant Corda was the Superintendent of the Norwalk Public Schools.  The defendant Norwalk Board of Education hired both Moore and Corda.

*May 2002 Evaluation*

In early May 2002, one of DeMoss's students called him a "faggot."  (Doc. #97-2, at 4, ¶ 14).  DeMoss referred the student to Moore for discipline and Moore, in turn, suspended the student.  Shortly after that incident, on or about May 13, 2002, Moore conducted her final teacher evaluation of DeMoss for the 2001-2002 school year. Under the heading "Recommendations," Moore noted,

> Mark's absences created concerns of continuity in the classroom this year. Attendance must be improved.  Mark came to West Rocks with no carry-over sick days and no carry-over personal days.  Thus far, for school year 2001-02, Mark has been absent eight days under the code, "01"—illness.

(Doc. #97-3, at 96).  Around the time of the "faggot" incident, DeMoss's grandfather died, at which time DeMoss took five days of bereavement leave as authorized under the collective bargaining agreement ("CBA") in effect at that time between the Norwalk Board of Education and the Norwalk Federation of Teachers. Pursuant to the CBA, leaves of absence lasting five days or fewer for the bereavement of "immediate family" members, including grandparents, are not charged against any other type of leave.  Bereavement days aside, DeMoss took eight sick days and one personal day during the 2001-2002 school year. The CBA authorized fifteen sick days and two personal days each school year. In the period immediately following the "faggot"

incident, another teacher at WRMS observed a shift in Moore's behavior toward DeMoss "from collegial to hostile." (Doc. #97-9, at 5, ¶ 17).

In addition to Moore's concern about DeMoss's absences, Moore also noted perceived problems with the timing of DeMoss's grade submissions in the May 13, 2002 evaluation:

> Grade reports must be submitted on time.  The fourth quarter interim reports were not submitted nor was it possible to contact Mark to determine the location of his grading information.

(Doc. #97-3, at 96). Documentation submitted by both parties, however, indicates that "students received the . . . Interim Report form on the scheduled fourth quarter interim report day, May 16, 2002." (Docs. #80-2, at 27 and 97-3, at 97).

*The "Pink" Incident*

During a class in September 2002, a student disrupted DeMoss's lesson, interjecting, "What is your favorite color?"  When DeMoss replied, "blue," the student giggled, "Oh, I thought it was pink." (Doc. #97-2, at 6, ¶ 20).  Believing the remark to be a reference to his sexual orientation, DeMoss ignored her and continued the lesson. DeMoss was troubled by the student's comment and later sought advice from his assigned mentor as well as another experienced WRMS teacher.  He was advised to and did send a sealed letter to the parents of the student to alert them of the incident.  (Dkt. 97-2, ¶ 21.)  DeMoss did not report the incident to Moore. The CBA provides that "the responsibility for immediate discipline in the classroom is rightfully that of the teacher."  (Doc.# 97-7, at 39). According to DeMoss, he was also concerned that bringing Moore's attention to the comment would further intensify what he perceived as antagonistic sentiment toward him, which DeMoss believed began developing shortly after the "faggot" incident earlier that year. The parents of the student who had made the "pink" comment signed and returned the letter to DeMoss and later apologized to him at an open house at WRMS.

3

Moore subsequently spoke to DeMoss about the "pink incident," telling him that the parents of the student in question were planning to sue DeMoss because he had indicated that their daughter's comments could be interpreted as sexual harassment. Moore also told DeMoss that they should meet about the incident and he should bring a union representative to that meeting. Although the parents of this student denied expressing anger or making legal threats concerning the letter DeMoss had sent to them, Moore conducted her own investigation of the incident, questioning DeMoss's students about the particulars of the incident and their interest in his sexual orientation.

*The Connecticut Pre-Engineering Program*

During the 2001-2002 and 2002-2003 school years, DeMoss served as the faculty supervisor at WRMS for the Connecticut Pre-Engineering Program ("CPEP"). Students who applied for and were admitted into the CPEP program were taught science and math engineering concepts. Selection for the program was supposed to be based on a student's merit.

The "R. V." Incident

During a CPEP orientation meeting held by DeMoss on October 17, 2002, one of the students in attendance, "R.V.," became loud and disruptive, saying to DeMoss, "I just love it when I get on your nerves.  Your face turns red. Your hair turns straight up."  (Doc. #97-2, at 9, ¶ 31).  The same student then yelled and made a motor sound with spit coming out of his mouth. DeMoss then dismissed R.V. from the meeting because of his behavior and because the student had completed his CPEP application.

On October 27, 2002, Moore reprimanded DeMoss for unprofessional conduct in his handling of the R.V. incident, telling him that he should not have dismissed the student from the meeting, and that he should have referred the matter to her for further investigation and/or

discipline.  A subsequent investigation into the matter, ordered by Moore, determined that several students who had been sitting at the same table as R.V. during the CPEP orientation meeting had been making jokes concerning DeMoss's sexual orientation. DeMoss never heard these remarks and never attributed any such remark to R.V. According to DeMoss, Moore later led R.V.'s mother to believe that R.V. had been dismissed from the meeting because DeMoss believed R.V. had made derogatory comments about his sexual orientation. R.V. was denied admission to the CPEP program on the basis of grades, behavior, and teacher recommendations. R.V.'s mother subsequently told DeMoss that she believed he denied R.V. admission to the CPEP program because of a comment made at the meeting about DeMoss's sexual orientation that DeMoss attributed to R.V.

Race Considerations in CPEP

On October 23, 2002, DeMoss asked the Connecticut CPEP Deputy Director, Maureen Coelho ("Coelho"), for clarification of the admission criteria for the CPEP program. Coelho responded by telling DeMoss that CPEP admission "was to be primarily merit based and teacher recommendation based and not primarily race based." (Doc. # 97-8, at 2, ¶ 5). Moore subsequently told DeMoss that the CPEP program was primarily aimed at African-Americans. Moore instructed DeMoss to admit specific students to the CPEP program because they were African-American, and further instructed him to admit African-American students to the exclusion of white students. According to Coelho, there was "no legitimate reason for Dr. Moore to have any input, comment or supervisory role in administering CPEP student selection. The decision to select a student for CPEP should be ultimately in the teacher's hands." (Id., ¶ 3).

On December 17, 2002, Moore contacted the CPEP district coordinator and stated that DeMoss was not recruiting enough African-American students into the program. On January 6,

2003, Moore asked DeMoss to send her a list of the applicants and admittees to the CPEP

program; DeMoss provided that information on January 8, 2003. At a meeting to discuss CPEP

held on January 16, 2003, Moore told DeMoss that CPEP was for black students and she

expressed her anger that DeMoss was using test scores, teacher recommendations and grades to

accept students into the program rather using race as an admission criterion.

*Removal of DeMoss from His Classroom*

Between May 12, 2003, and June 2, 2003, DeMoss was absent from school because he had

fallen ill with shingles. During this period more than one substitute teacher covered his classes.

Each day he was absent, DeMoss provided lessons plans for the teacher who was substituting for

him.  When DeMoss returned to school on June 3, 2003, Moore conducted an unannounced class

observation of his first and second period classes. Moore did not take notes during her class

observation, but sat in the back of the classroom staring at DeMoss as he taught. During the time

Moore was conducting her class observation  DeMoss began to feel physically ill. After speaking

to his union representative, DeMoss left WRMS and took a sick day.

DeMoss returned to school on June 9, 2003, and was instructed by Moore not to go to his

classroom. Instead, he met with Corda,  Fay Ruotolo ("Ruotolo"), who was the Human

Resources Officer for the Norwalk Public Schools, and his union representative. At that meeting,

Corda questioned DeMoss about his absence and inquired as to documentation concerning his

illness and absence from school. At that time, approximately ten or eleven days remained in the

school year.

On June 10, 2003, a letter from Corda was hand-delivered to DeMoss. In the letter, Corda

 stated that "given the lateness of the school year, I believe it is better for you to provide

assistance to the substitute teacher who will continue to teach your classes." (Doc. # 97-5, at 50).

Corda's letter went on to inform DeMoss that he should report to work each day and review has

daily work plans with Moore. He was further advised that he would be assigned a work location

where he would be expected to perform his duties, and that any necessary communication with

students "should only indicate that because of the lateness of the school year, the substitute

teacher, with your assistance, will be teaching your classes for the remainder of the year. No

further information is necessary." (Id. at 51). The substitute teacher who covered DeMoss's

classes from June 9, 2003, through the end of the school year was not one of the substitutes who

had covered his classes during his absence due to illness.

On June 11, 2003, DeMoss went to the second floor at WRMS to give his lesson plan to

the substitute teacher covering his classes. Moore approached DeMoss and told him he was not

permitted to be on the second floor or to have contact with his students. She also told him she

had assigned him to work in the "conference room," which was a room outside her office that

had previously been used as a storage/supply room. DeMoss spent the remainder of the 2003

school year working in this room, which measured approximately seven feet by ten feet. During

the time DeMoss was working in this room, Moore also used the room as a place where students

were sent for detention. DeMoss was not permitted to close the door to the room to which he had

been assigned.

*Letters from Moore*

On June 16, 2003, DeMoss received a letter from Moore dated June 13, 2003, containing

allegations that DeMoss had engaged in unauthorized interactions with students, placed a

document in the mailboxes of staff, and left his assigned work room without permission. Later

that same day, June 16, 2003, Moore authored another letter to DeMoss in which she stated "I

was informed that you went to a teacher's classroom [today] and asked the teacher to complete

7

the anonymous survey[1]." (Doc. # 97-5, at 68). In her letter, Moore directed DeMoss "to do your work in the conference room,"  "NOT to approach persons regarding the survey," and "not to go to the classroom [sic] of other teachers without the permission of administration." (Id.).

*DeMoss's Complaints About Sexual Orientation Discrimination*

DeMoss submitted three complaints to Norwalk Public Schools' Human Resources Office ("HRO") about the discrimination he felt he was experiencing on account of his sexual orientation as well as his refusal to use race as a primary factor in admissions into CPEP. Initially, DeMoss spoke with Bruce Mellon, a union leader, on or about October 28, 2002. The first complaint to the HRO was verbally conveyed to Ruotolo on March 13, 2003.  The second complaint was made to Bruce Morris ("Morris"), an African-American Human Relations Director for Norwalk Public Schools, whose wife was directly supervised by Moore, on or about June 13, 2003. The third complaint to the HRO was made to Ruotolo on June 16, 2003. After meeting with DeMoss on June 16, 2003, Ruotolo acknowledged his complaint and told him she would speak to the superintendent about the matter.

Following DeMoss's complaint to him, Morris opened an investigation into the allegations of discrimination. In his Investigative Report, issued under cover letter dated August 5, 2003, Morris found that DeMoss's complaint was made in reckless disregard of the truth, and that DeMoss had actively undermined Moore's administration of WRMS. Morris advised DeMoss that the results of the investigation would be referred to Corda for appropriate action.

*Suspension & Termination of DeMoss's Employment*

On January 9, 3003, Moore conducted an observation of DeMoss's Sixth Grade General

---

[1]This appears to refer to "a survey designed to gauge other teacher's perceptions of the administration and in particular Lynne Moore," that was initiated by a woman who was the parent of a WRMS student and who had worked with DeMoss at Fox Run Elementary School and assisted him as a volunteer at WRMS. (Doc. # 97-10, at 3, ¶ 6).

Math class.  The lesson that DeMoss presented during that class came from a math teacher with 30 years of experience and dealt with the multiplication of fractions by folding paper. In her evaluation of the January 9, 2003 observation, Moore noted that the paper-folding activity was "confusing . . . [and] did not correspond to multiplying fractions," and that DeMoss "did not demonstrate a depth of understanding about the concepts which he desired to teach." (Doc. # 97-4, at 103).

Later that same day, January 9, 2003, Moore submitted DeMoss's name for non-renewal to Ruotolo. Pursuant to a memorandum Ruotolo had sent to various administrators, including Moore, in November 2002,the names of teachers who might be recommended for non-renewal for the 2003-2004 school year were required to be sent to Ruotolo by December 20, 2002.

By letter dated January 9, 2003, Moore notified DeMoss that she had submitted his name to Ruotolo for non-renewal of his teaching contract for the 2003-2004 school year, and that a final decision regarding non-renewal would be made by February 14, 2003. On March 4, 2003, Moore drafted her Final Appraisal Report of DeMoss. In that report, Moore indicated that DeMoss lacked depth in the content areas of math and science, presented information inaccurately or in a confusing manner, and lacked a repertoire of hands-on activities. By letter dated March 14, 2014, Corda informed DeMoss that Corda would be recommending that DeMoss's contract not be renewed for the following school year.

Following a request by DeMoss and his legal counsel that Corda reconsider the decision not to renew DeMoss's contract, DeMoss received a letter from Ruotolo dated April 1, 2003, stating that the Board of Education would not be considering the non-renewal of DeMoss's contract at that time, and that the administration of the Norwalk Public Schools had elected "to provide one more year of supervision and support prior to consideration of tenure." (Doc. # 97-5,

at 14).  Ruotolo went on to advise DeMoss that a "plan of action will be developed as a part of

your evaluation plan for the remainder of this school year and for next year. This plan will be

developed collaboratively with Dr. Lynne Moore, Principal of West Rocks Middle School, and

Dr. Muriel Gerhard, Supervisor of Math and Science." (Id.)

On April 11, 2003,  DeMoss requested a transfer out of WRMS for the 2003-2004 school

year. On April 24, 2003, DeMoss asked Jackie Gray ("Gray"), who was an aide at the Fox Run

Elementary School, to come to WRMS and assist him in preparing his BEST[2] Program portfolio.

The Best Program required the beginning educator to have an aide video tape his teaching,

because the beginning educator could not teach and record a lesson at the same time. Upon

arrival on the 24th, Gray received a visitor's pass. Moore was unaware that Gray would be

visiting DeMoss's classroom that day. In a letter dated April 25, 2003, Moore reprimanded

DeMoss for having  Gray in his classroom without her prior approval, stating, "You are NOT to

have guests in your classroom without speaking to the principal directly for clearance." (Doc. #

97-5, at 19).

On April 29, 2003, DeMoss, his attorney, his union representative, Dr. Muriel Gerhard,

Moore, and  Ruotolo met to develop the "plan of action" referenced in Ruotolo's April 1, 2003

letter to DeMoss.  No weakness in DeMoss's teaching methods was cited at that meeting by any

representative of the Norwalk Public Schools with the exception of a suggestion that he

strengthen his content area.

On May 13, 2003, one day into DeMoss's extended absence due to shingles, Ruotolo sent

DeMoss a draft "Plan of Support 2003-04," the product of the April 29 meeting, which

articulated various concerns, objectives, and rubrics for improvement relating to DeMoss's

---

[2]The acronym BEST stands for Beginning Educator Support and Training  (Doc. # 97-2, at 7, ¶ 21).

practice as a teacher at WRMS. (Doc. # 97-5, at 26-27). In the cover letter sent with the draft

plan, Ruotolo requested that DeMoss "review this plan with you[r] attorney, your NFT [union]

representative, and any other person whom you wish to assist you, and return it to me with your

questions, concerns, and suggestions no later than Friday, May 30, 2003." (Id. at 24). The draft

Plan of Support contained a signature and date line below the statement "I acknowledge receipt

of this plan." (Id. at 27). DeMoss remained absent from school until June 3, 2003, and upon his

return again fell ill and was absent until June 9, 2003.

On August 5, 2003, Morris issued his final report on DeMoss's discrimination complaint in

which he concluded that DeMoss's complaint was made in reckless disregard of the truth, and

that DeMoss had actively undermined Moore's administration of WRMS. That same day, Corda

notified DeMoss that he had scheduled a meeting to discuss DeMoss's status as a certified

employee of the Norwalk Public Schools and that DeMoss was entitled to union representation at

the meeting. On August 20, 2003, Corda met with DeMoss, DeMoss's attorney, and Ruotolo. At

that meeting Corda told DeMoss that he would be terminated as a result of concerns about his

teaching certification and asked DeMoss whether he would be willing to resign. DeMoss

clarified that he was certified and stated that his mail was being sent to the wrong address.

Nothing else was discussed at that meeting.

On August 22, 2003, the day before school started, Ruotolo called DeMoss and told him

that he would be suspended with pay on the basis of the findings contained in the report issued

by Morris. On that same day, DeMoss  received a letter from Corda, notifying him that "effective

immediately, you are suspended from duty, with pay, pending the completion of proceedings to

terminate your contract of employment." (Doc. # 97-6, at 2).

In response to a letter from DeMoss's attorney requesting the reasons for the proposed

11

termination of DeMoss's employment, Corda provided the following reasons in a letter dated

September 2, 2003:

> 1.  Problems with teaching performance, as summarized in documents prepared by representatives of the Administration, including but not limited to planning, appropriate use of classroom time, and depth of understanding about the concepts to be taught to students;
> 2.  Problems with the timely preparation of report cards;
> 3.  Interfering with the operation of the school and disruption of the learning environment by disturbing or interfering with both students and staff members during work and school time in connection with the taking of a survey not conducted as a part of school curriculum;
> 4.  Leaving his assigned work location without appropriate administrative authorization.

(Doc. # 80-4, at 34). On October 8 2003, Corda notified DeMoss that the Norwalk Board of

Education had met on October 7, 2003, and voted to terminate DeMoss's contract of

employment effective immediately.

## II.  DISCUSSION

Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, the Plaintiff voluntarily

dismissed counts one through five (alleging First Amendment retaliation against DeMoss by

Moore, Corda and the Board) and count 17 (alleging that all defendants violated Connecticut

General Statutes § 31-51q). The remaining twelve counts (counts six through sixteen and count

eighteen) will be discussed below.

## A.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56 (a).  Summary judgment is appropriate if, after discovery, the nonmoving party has

"failed to make a sufficient showing on an essential element of [his] case with respect to which

[he] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The burden is on the moving party to establish that there are no genuine issues of material

fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).  Although summary judgment may be appropriate in an employment discrimination case, "[a] trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue." Desir v. City of New York, 453 F. App'x 30, 33 (2d Cir. 2011) (internal quotation marks omitted).

## B.  EQUAL PROTECTION

Five counts of DeMoss's amended complaint allege racial discrimination in violation of the Equal Protection Clause of the United States Constitution (Counts Six through Ten). "A plaintiff may establish a claim for violation of [his] right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is 'essentially a direction that all persons similarly situated should be treated alike.'" Wright v. City of Syracuse, 5:10-CV-0661 (GTS/TWD), 2014 U.S. Dist. LEXIS 44524, at *49 (N.D.N.Y. March 31, 2014) (quoting City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985)). "[W]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated[] remains an essential component  of such a claim . . . ." Thompson v. New York City, 12 Civ. 8034 (PAE), 2013 U.S. Dist. LEXIS 172993, at *24 (S.D.N.Y. Dec. 9, 2013).

In support of their motion for summary judgment the defendants argue that DeMoss has failed to show, or even plead, that he was treated differently "from others similarly situated." "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324).

In responding to the defendants' motion for summary judgment, DeMoss did not point to specific facts that would support a finding that he had been treated differently from others similarly situated. Rather, he argued that "both DeMoss' complaint . . . and the unrefuted evidence support DeMoss' claim that Moore retaliated against him because he refused to implement her racially discriminatory policy, i.e., he did not accept students simply because they were African-American, and he did not favor African-American applicants over white students." (Doc. # 96, at 57). However, "a claim of retaliation for complaining of race discrimination is not properly brought under the Equal Protection Clause." Wright, 2014 U.S. Dist. LEXIS 44524, at *50. Consequently the defendants' motion for summary judgment is granted as to the equal protection claims asserted in Counts Six through Ten of the amended complaint.

C.  TITLE VII

As was the case with regard to his Equal Protection claims, DeMoss has specified that his Title VII and CFEPA[3] race discrimination claims (Counts Eleven, Twelve, Thirteen, and Sixteen) arise out of his contention "that Moore retaliated against him because he refused to implement her racially discriminatory policy, i.e., he did not accept students simply because they

---

[3] "[T]he standards governing [the plaintiff's] CFEPA and Title VII claims are one and the same." Tucker v. Journal Register East, 520 F. Supp. 2d 374, 380 n.1 (D. Conn. 2007).

14

were African-American, and he did not favor African-American applicants over white students."
(Doc. # 96, at 57). Title VII prohibits an employer from discriminating against an employee
"because he has opposed any practice made an unlawful employment practice by this subchapter
. . . ." 42 U.S.C. §2000e-3(a).

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show:
"[1] participation in a protected activity known to the defendant; [2] an employment action
disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the
adverse employment action." Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 134 (2d
Cir. 1999) (internal quotation marks omitted). A plaintiff's good faith, reasonable belief that the
challenged actions of the employer violated the law may qualify as a protected activity under
Title VII. Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001). In order to constitute protected
activity under Title VII, however, the employee's complaint cannot relate to "just any law - - the
employee is required to have had a good faith, reasonable belief that he was opposing an
employment practice made unlawful by Title VII." Kelly v. Howard I. Shapiro & Associates
Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted).

DeMoss alleges that he was retaliated against because he opposed a policy or practice that
discriminated against students on the basis of their race. The question is whether this is a
protected activity, i.e., opposition to an employment practice made unlawful by Title VII. Other
courts that have considered similar situations have concluded that "Title VII does not cover such
activity." Rodriguez v. International Leadership Charter School, 08 Civ. 1012 (PAC), 2009 U.S.
Dist. LEXIS 26487, at *18 (S.D.N.Y. March 30, 2009). In Rodriguez, the plaintiff claimed that
she was terminated from her teaching position because she complained about discriminatory
treatment of some of her students. The court determined that such a complaint was not a

protected activity under Title VII: "Rodriguez's contention that her students were discriminated against because of their race or national origin cannot give rise to a Title VII claim because the students' employment rights were not violated." Id., 2009 U.S. Dist. LEXIS 26487, at *18-19; see also Wimmer, 176 F.3d at 135 ("'Not every act by an employee in opposition to racial discrimination is protected [under Title VII]. The opposition must be directed at an unlawful employment practice of an employer . . . .'")(quoting Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978)).

"Title VII is not a general 'bad acts' statute. Rather, the conduct it prohibits is specifically set forth . . . . While Congress may decide to extend the statute's coverage to persons who bring any discriminatory practice of an employer to light, such a step lies beyond the province of the courts." Id. (internal quotation marks omitted). Title VII's coverage does not extend to the claims made by DeMoss in Counts Eleven, Twelve, Thirteen, and Sixteen. Consequently, the defendants' motion for summary judgment is granted as to those counts.

D. CFEPA – SEXUAL ORIENTATION

In Counts Fourteen and Fifteen, DeMoss claims that he was discriminated against because of his sexual orientation and that he was retaliated against because he filed complaints about that discrimination. Both of these counts are brought pursuant to CFEPA.

CFEPA broadly prohibits discrimination by an employer based on an individual's "race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical disability. . . ." Conn. Gen. Stat. § 46a-60(a)(1). In 1991, the Connecticut legislature broadened the scope of CFEPA by enacting Conn. Gen. Stat. § 46a-81c, which explicitly prohibits discrimination by an employer "in terms, conditions or privileges of employment

because of the individual's sexual orientation . . . ."

Connecticut courts rely on federal precedent in reviewing claims arising out of state employment discrimination laws.  See Bd. of Educ. of the City of Norwalk v. Comm'n on Human Rights and Opportunities, 266 Conn. 492, 505 n.18 (2003). "McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases" Id. at 505 (internal quotation marks omitted).  Under the burden-shifting framework of McDonnell Douglas, a plaintiff claiming discriminatory treatment must first "establish a prima facie case of discrimination by showing that: (1) []he is a member of a protected class; (2) []he is qualified for [his] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Humphreys v. Cablevision Systems Corp., No. 12-4431-cv, 2014 U.S. App. LEXIS 924, at 2 (2d Cir. Jan. 17, 2014) (internal quotation marks omitted). Once a plaintiff establishes a prima facie case under McDonnell Douglas, "the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue." Bir v. Pfizer, Inc., 510 F. App'x 29, 30 (2d Cir. 2013). If the employer articulates a non-discriminatory reason for the adverse employment action, "the burden then shifts back to the plaintiff to show that the defendant's proffered explanation is pretextual." Id.

The Court has little difficulty concluding that DeMoss has satisfied the first three prongs of the prima facie case. By virtue of identifying himself as a homosexual male, (doc. # 97-2, at 1, ¶ 3), DeMoss has demonstrated that he is a member of a protected class. While the issue of DeMoss's performance is a disputed matter, there is no genuine dispute that he was, as a certified teacher, qualified for his position. Given that he was terminated from his teaching position, it is

17

also clear that DeMoss was subject to an adverse employment action. In addition to his termination, DeMoss was, according to his version of the facts, removed from his classroom and placed in the after-school detention room during school hours, prohibited from speaking with students and visiting the classrooms of other teachers, and not allowed on the second floor of the school building. "An adverse employment action is a materially adverse change in the terms and conditions of employment, which can include . . . significantly diminished material responsibilities." <u>Adams v. Festival Fun Parks</u>, LLC, No. 13-1183-cv, 2014 U.S. App. LEXIS 5292, at *5 (2d Cir. March 21, 2014) (internal quotation marks omitted). The Court finds that these changes in the terms and conditions of DeMoss's employment also qualify as an adverse employment action for purposes of his sexual orientation discrimination claims.

The remaining question is whether DeMoss has provided facts demonstrating that the circumstances of the adverse employment actions taken against him give rise to an inference of discrimination. DeMoss has provided evidence which, if believed by the trier of fact, demonstrate a significant change in Moore's treatment and evaluation of him after she became aware of his sexual orientation. For example, in her first evaluation of DeMoss, which was dated November 8, 2001, Moore commented that the math lesson she had observed "was organized into very tight time blocks, and there was no 'down time.'" (Doc. # 97-3, at 88). Her only recommendation in that evaluation was that he "[u]se a seating chart format to keep track of the students who have not been called upon." (<u>Id.</u>). In her second evaluation report, dated February 11, 2002, Moore commented that DeMoss "was well-prepared to teach the lesson." (<u>Id.</u> at 91). Her recommendation was that he "discuss fewer concepts and provide more practice on those concepts." (<u>Id.</u>). In a third evaluation report, signed on March 22, 2002, Moore commented that "[t]he lesson was organized with time spent for direct instruction and time spent on practice."

(Id. at 94). The recommendations section of the report indicated that "[t]here was too much noise during the work time, and there were some students who were not discussing math." (Id.).

DeMoss informed Moore in early May 2002 that one of his students had called him a "faggot." On or about May 22, 2002, Moore issued her final evaluation report concerning DeMoss. The recommendations section of the final report included the statement that "Mark's absences created concerns of continuity in the classroom this year. Attendance must be improved. . . . Thus far, for school year 2001-02, Mark has been absent eight days under the code, '01' – illness." (Id. at 96). DeMoss has provided evidence that the CBA authorized fifteen sick days per school year. Moore's report also stated that "[g]rade reports must be submitted on time. The fourth quarter interim reports were not submitted nor was it possible to contact Mark to determine the location of his grading information." (Id.). There is evidence before the Court indicating that the grades were submitted on time. Going forward, Moore's evaluations of DeMoss became increasingly critical and her treatment of him became increasingly harsh, culminating in the adverse employment actions noted above.

"[T]he burden of establishing this prima facie case in employment discrimination cases is 'minimal.'" McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). The Court finds that DeMoss has met this minimal burden with regard to his claim of discriminatory treatment on the basis of his sexual orientation. The defendants have likewise met their burden of articulating a non-discriminatory reason for the adverse employment actions. According to the defendants, DeMoss was terminated for the following reasons:

> 1. Problems with teaching performance, as summarized in documents prepared by representatives of the Administration, including but not limited to planning, appropriate use of classroom time, and depth of understanding about the concepts to be taught to students;
> 2. Problems with the timely preparation of report cards;
> 3. Interfering with the operation of the school and disruption of the learning environment by disturbing or interfering with both students and staff members during work

and school time in connection with the taking of a survey not conducted as a part of school curriculum;

    4.  Leaving his assigned work location without appropriate administrative authorization.

(Doc. # 80-4, at 34).

Because the defendants have satisfied their burden of production by articulating non-discriminatory reasons for the adverse employment action taken against DeMoss, the burden shifts back to DeMoss to show that the reasons articulated by the defendants are a pretext for discrimination. "Such pretext may be demonstrated either by reliance on the evidence comprising the *prima facie* case or by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Piela v. Connecticut Department of Correction, No. 3:10cv749 (MRK), 2012 U.S. Dist. LEXIS 59148, at *20 (D. Conn. April 26, 2012) (internal quotation marks omitted).

The Court believes that the evidence comprising DeMoss's prima facie case is sufficient to show pretext. Additionally, other evidence demonstrates "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons." Another teacher at WRMS observed a shift in Moore's behavior toward DeMoss "from collegial to hostile" after he had reported to her that one of his students had called him a "faggot." (Doc. # 97-9, at 5, ¶ 17). While the defendants cite a problem with the timely preparation of report cards as one of the reasons for DeMoss's termination, evidence before the Court contradicts this statement. Similarly, the problems with teaching performance cited by the defendants is inconsistent with the evaluations of DeMoss that pre-date the reporting of the "faggot" incident to Moore.

With respect to the stated reason of leaving his assigned work location without appropriate administrative authorization, DeMoss has provided evidence that he was subjected to unusually restrictive, if not punitive, working conditions following his return to work from an illness in June 2003. He has also provided evidence that upon his return from that illness he was told that a substitute teacher would continue to teach his classes in order to ensure continuity in the classroom, even though the substitute teacher who covered his classes for the remainder of the school year (approximately 12 school days) was not one of the substitutes who had covered his classes during his absence. Because DeMoss has satisfied his McDonnell Douglas burden of showing pretext, the defendants' motion for summary judgment is denied as to Count Fourteen, discriminatory treatment on the basis of sexual orientation.

In Count Fifteen, DeMoss claims he was retaliated against for having filed complaints of sexual orientation discrimination. CFEPA prohibits retaliation against employees who "oppose[] any discriminatory employment practice . . . ." Conn. Gen. Stat. §46a-60(a)(4). "The elements of a claim of retaliation under §46a-60(a)(4) are the same as for a retaliation claim under Title VII." Miller v. Edward Jones & Co., 355 F. Supp. 2d 629, 642 (D. Conn. 2005). "In order to establish a *prima facie* case of retaliation, a plaintiff must show that: [1] he engaged in protected participation or opposition under Title VII [or CFEPA], . . . [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 248 (D. Conn. 2008) (internal quotation marks omitted).

The defendants contend that DeMoss has failed to establish the second and fourth prongs of the prima facie case. As to the second prong, i.e., the employer's awareness of the protected

activity, the defendants argue that DeMoss has not established that the Board had any awareness

of him or any complaint he had made prior to its October 7, 2003 vote to terminate his

employment.  "However, for purposes of a prima facie case, a plaintiff may rely on general

corporate knowledge of [his] protected activity to establish the knowledge prong of the prima

facie case." Kwan v. Andalex Group, LLC, 737 F.3d 834, 844 (2d Cir. 2013). DeMoss has

provided evidence that prior to the time the Board terminated his employment he had complained

to both Ruotolo, the Human Resources Officer for the Norwalk Public Schools, and Morris, the

Human Relations Director for the Norwalk Public Schools, about Moore's harassment of him

due to his sexual orientation. DeMoss's complaints to these officials satisfy the knowledge prong

of the prima facie case.

     With regard to causation, the defendants argue there is no evidence that the plaintiff's June

2003 complaint to Morris about Moore's harassment due to his sexual orientation "served as a

catalyst for the Norwalk Board of Education's October 7, 2003 vote to terminate his contract of

employment." (Doc. # 83-2, at 35). The causal connection prong of the prima facie case can be

satisfied by demonstrating temporal proximity, i.e., "that the protected activity was closely

followed in time by the adverse action." Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001). DeMoss

has provided evidence that he filed a complaint with Morris on or about June 10, 2003 and that

Morris issued an investigative report concerning that complaint on August 5, 2003. On August

20, 2003, DeMoss was told by Superintendent Corda that he would be terminated, and on August

22, 2003, DeMoss was suspended with pay pending the completion of proceedings to terminate

his employment. The Court finds the temporal proximity of these events sufficient to satisfy the

fourth prong of the prima facie case.

     Since the McDonnell Douglas framework applies equally to retaliation claims, once the

plaintiff establishes his prima facie case, the burden shifts to the defendants to articulate a non-discriminatory reason for the adverse employment action. See Richardson v. New York State Department of Correctional Service, 180 F.3d 426, 443 (2d Cir. 1999). Here the defendants rely on the same non-discriminatory reasons they articulated with respect to DeMoss's discriminatory treatment claim and have thus satisfied their burden of production.

Because the defendants have met their burden of production, DeMoss "must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason[s] merely a pretext for impermissible retaliation." Id. For the same reasons the Court found that DeMoss had shown pretext with regard to his discriminatory treatment claim, the Court also finds that he has shown pretext with regard to his retaliation claim. Moreover, the evidence before the Court demonstrates a direct link between DeMoss's complaint to Morris about sexual orientation discrimination and his termination. Morris sent his "Investigative Report" on that complaint to DeMoss under cover letter dated August 5, 2003. (Doc. # 97-5, at 83). In that letter, Morris stated, "I must conclude that your complaint against Dr. Moore was made in reckless disregard of the truth. . . . Please be advised that I intend to refer the results of my investigation to the Superintendent of Schools for appropriate action." (Id.). On August 22, 2003, Ruotolo told DeMoss that he would be suspended with pay based on the findings contained in Morris's report. That same day, DeMoss received a letter from Superintendent Corda informing him that he was suspended with pay "pending the completion of proceedings to terminate your contract of employment." (Doc. # 97-6, at 2). There is a genuine dispute between the parties as to the validity of the sexual orientation complaint and the adequacy of the investigation of that complaint. It is clear, however, that the report that was generated as a result of DeMoss's complaint played a significant part in his termination.

The Court recognizes that the Supreme Court recently held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." University of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 2534 (2013). The Court also realizes that "the Connecticut Supreme Court has not yet addressed whether the Nassar formulation of causation applies under the CFEPA . . . ." Gaston v. Sun Services, LLC, Civil No. 3:11cv1970 (JBA), 2014 U.S. Dist. LEXIS 39698, at *27 n.9 (D. Conn. March 26, 2014). This Court finds that the facts adduced by DeMoss satisfy the causation standard regardless of the applicability of Nassar to a CFEPA retaliation claim.[4] Because DeMoss has demonstrated that a reasonable jury could find that the defendants' non-discriminatory reasons were a pretext for discrimination, the defendants' motion for summary judgment is denied as to Count Fifteen, retaliation for complaining of sexual orientation discrimination.

E.   CONN. GEN. STAT. § 31-51M

Count Eighteen of the amended complaint alleges a claim pursuant to Conn. Gen. Stat. § 31-51m. That statute provides in pertinent part that "[n]o employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation . . . to a public body . . . ." Conn. Gen. Stat. § 31-51m (b).

The defendants have moved for summary judgment on all counts remaining in the amended complaint and their memorandum in support of their motion includes argument specific

---

[4] In a similar vein the Court notes the Second Circuit's observation that "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." Kwan, 737 F.3d at 846 n.5.

to the Count Eighteen claim brought pursuant to Conn. Gen. Stat. § 31-51m.  (Doc. # 83-2, at 1-4). The plaintiff DeMoss's opposition to the motion for summary judgment does not address the defendants' argument concerning the claim brought pursuant to Conn. Gen. Stat. § 31-51m. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) (internal quotation marks omitted). Because the plaintiff has failed to address the claim brought pursuant to Conn. Gen. Stat. § 31-51m, the Court deems that claim abandoned and the defendants' motion for summary judgment is granted as to Count Eighteen.

## F. SUPPLEMENTAL JURISDICTION

The Court has granted the defendants' motion for summary judgment as to all of the federal claims raised in the plaintiff's amended complaint. The remaining claims, Counts Fourteen and Fifteen, raise state law claims against one or more of the defendants. The defendants maintain that under these circumstances the Court should decline to exercise its jurisdiction over the remaining state claims.

"A district court's decision whether to exercise . . . jurisdiction [over state law claims] after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). "District courts weigh several factors in determining whether to exercise supplemental jurisdiction, including 'the values of judicial economy, convenience, fairness and comity.'" Chenensky v. New York Life Insurance Co., 942 F. Supp. 2d 388, 391 (S.D.N.Y. 2013)) (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)).

The Court believes that a consideration of the relevant factors favors the exercise of

supplemental jurisdiction. This case will be considered trial ready once this ruling on the defendants' motion for summary judgment is issued. Additionally, the remaining state law claims are brought pursuant to CFEPA and Connecticut courts rely on federal precedent in reviewing discrimination claims arising out of CFEPA.  See Bd. of Educ. of the City of Norwalk v. Comm'n on Human Rights and Opportunities, 266 Conn. 492, 505 n.18 (2003). Accordingly, the Court chooses to exercise supplemental jurisdiction over the remaining state law claims.

CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment (**doc. # 79**) is **GRANTED in part** and **DENIED in part**.  The defendants' motion is granted as to Counts Six through Ten, Counts Eleven through Thirteen, Count Sixteen, and Count Eighteen. The motion is denied as to Counts Fourteen and Fifteen.

All claims against the defendants Lynne Moore and Salvatore Corda are dismissed. This case will proceed only as to the following two counts against the defendant Norwalk Board of Education: Count Fourteen, sexual orientation discrimination and Count Fifteen, retaliation for complaining of sexual orientation discrimination.

**SO ORDERED** at Hartford, Connecticut this    9th        day of  May, 2014.


_____ /s/ DJS_____
                 DOMINIC J. SQUATRITO
                 UNITED STATES DISTRICT JUDGE